Please be seated. So we're happy to hear argument in our second case, the United States v. Cunningham. Good morning. I'm John McNichols on behalf of Semyya Cunningham, the appellant. May it please the court. Our appeal in this case concerns the residual hearsay exception of Federal Rule of Evidence 807. It is uniformly held by all the circuits, including this one, to be applied very rarely and only after much consideration and examination. It is universally regarded as not intended to confer a broad license on trial judges. For that reason, and consistent with those standards, to apply it, the trial judge must find that the hearsay at issue has circumstantial guarantees of trustworthiness equivalent to those that underlie the recognized exceptions, such that cross-examination of the declarant would be of little utility. Courts, therefore, when evaluating the residual exception, look for the kind of circumstantial guarantees that you would see with cross-examined former testimony, statements against interest, statements under belief of impending death, excited utterances, and things of that nature. The circumstances surrounding the hearsay declarant in this case, Courtney Green is the declarant in this case, the circumstances surrounding her statements fell well short of that standard. And in fact, I think the record amply shows that cross-examination of Ms. Green would have been very informative for the trier of fact in this case. And thus, unless this court wants to grant a broad license to trial judges, the judgment of conviction must be reversed. So my Cunningham, my client, was- But you don't really, as I read it, you primarily disputed the existence of the circumstantial guarantees of trustworthiness by painting the mothers the bad actor. She's clearly a factor, Your Honor, that's right. And that is a contributor to- But by treating her as the bad, as the responsible, as the person, that Ms. Green had to conceal the existence of the policy from her mother, despite suffering terminal cancer because she didn't want her mother to know that she had left the proceeds to somebody else, she threatened Ms. Green if the latter denied the mother's claims of forgery. She contacted Transamerica, particularly Ms. Remington. Your challenges don't seem to go so much to the trustworthiness, the circumstantial guarantees of the trustworthiness, as to pointing a finger at the mother as the manipulator of the circumstances. Is that an unfair characterization?  Your Honor, certainly, I hope this has come across in our reply brief, that the circumstantial guarantees of trustworthiness that are the focus of the inquiry don't go, for example, to the integrity or probity of the declarant. In other words, you evaluate the circumstances that the person is in, including the circumstances that others around them put them in. And for that reason, the actions of the mother are relevant to what the declarant was actually facing in this instance. Are there other factors than the mother? If the factors feed into the mother, Your Honor, including the fact that All of them, pretty much, I thought. That's probably a fair characterization. That's probably a fair characterization. The mother is the principal source of the discomfort that Ms. Green had in this situation, although Assuming that she did. Assuming that she did, correct. But just to take one step back from that. Even if you discount the fact, for example, that her mother threatened her and impersonated her on the telephone with Transamerica. Well, threat is a characterization. In context, it's a little more nuanced than that. If you're going to support, as I recall, during the course of Ms. Cunningham's asking, the face time when Ms. Cunningham is asking Ms. Green to support her version of the transaction. That's correct. And the mother said, if you do that, you can go live with your brother. That's correct. That's what she said. Yeah. That's what she said. My only point, and it's not, I don't need to make as much of an advance. You can call it a threat if you like. It has a little more nuance to it. Fair enough, Your Honor. Fair enough. But one point I hope, again, that has come across is the fact that even if you discount that and you discount the pressure that her mother put on her by attending all her subsequent interviews, the mere fact that the statement was made to a parent in the confines of their home, which appears to be the district court's basis for finding that trustworthy, is not in and of itself something that grabs you as the kind of statement that would be inherently trustworthy. But we have, and I appreciate that, and I appreciate your arguments on the other side of the trustworthiness. I've read those, and I see arguments about trustworthiness. I see arguments against it. But for us, when we're looking at abuse of discretion standard, the district court relied on the relationship between the parent and the child as an indicia guarantee. With respect to the investigator, relied on there was no reason to lie at that point. And, Paul, I understand you believe there's evidence on the other side. When there's grounds like that and we're looking at abuse of the standard review, isn't that evidence that would support under that deferential standard? I don't think so, Your Honor. And I say this because if it's enough to make a statement to your parent, and if that's sufficient basis for finding trustworthiness, whether it occurs in your home, as the district court found or elsewhere, well, I mean, how far does that principle carry? Would it carry, for example, to a college student who's also dependent on her parents, talking about how her grades were or where she went for spring break or who she's dating? As a parent of teenagers, I can suggest I don't presuppose that my children of that age necessarily find me the easiest person to talk to. So even if you set aside the acts of... The district court credited the version that the mother put forward, in part because of the support from Ms. O'Donnell. The mother's version of this don't stand alone. And the court also accepted O'Donnell's assertion that she was attentive to the fact that Rogers had previously represented herself as green, although Rogers said she did so because of her daughter's illness. Right. It's understandable. And that O'Donnell was therefore careful to verify that she was speaking to green during the calls that issued here. That's right, Your Honor. So it's not just the mother. I mean, there is support for the mother's version of the events, whereas with respect to Ms. Cunningham, the one thing we do know is that at no point did green make Cunningham the beneficiary and in fact could not have, as I understood it, because she worked for the insurance company. That's correct. At no point was my client formally designated as the beneficiary, and the record showed that that would have been a policy violation had it happened. But I think we can read too much into the fact that Ms. O'Donnell gave a similar version of events of Courtney Green's statements, similar to what Ms. Rogers, the mother, said. You know, that's interesting because of that, Transamerica had to pay twice. So it would seem to me a disincentive for Ms. O'Donnell to believe that there was, in fact, a forgery on the part of one of its agents. Clearly, Ms. O'Donnell's… Is that not correct? No. Or at least facially, it would seem to me that Transamerica would have been better off not believing the mother and having paid out money under the death benefit, that it would have been better for the company not to believe the mother's version. Well, yeah, that may very well be the case, Your Honor. Why would that not be a disincentive? Well, it's certainly… If one were prone to skew the facts. Right. Certainly, Transamerica has an incentive only to pay legitimate claims and not to pay any illegitimate claims. Not to pay more than once. Not to pay more than once, certainly. But the question for purposes of this analysis is whether Courtney Green and the circumstances that she was in had any reason to believe that Transamerica would investigate closely what she said, as the district court suggested, which was without basis in the record. In other words… I don't understand that. I'm sorry. Yeah. You're positing that as the dispositive question. It certainly wasn't my question. For purposes of the standard of review, if you're weighing the evidence… Go ahead. All I was going to say, Your Honor, is that Your Honor's analysis of the incentives of Transamerica is probably something I can't quarrel with and makes perfect sense. My only point was that under the residual exception, the incentives we should be focused on would be those of Courtney Green, the declarant. And whether or not she had any knowledge of what Transamerica would do or how hard they were going to look at this policy, that I think is absent from the record. What does that go to, though? That goes to her motive to tell the truth or not. In other words, if she has a belief that what she says is going to be investigated, then certainly that could encourage her to be more forthcoming, would take away a motive to lie. Our point was, again, that there's no evidence in the record, notwithstanding the district court's mention of it, that Ms. Green was ever admonished or warned that a false statement to the insurance company could result in the loss of benefits or anything of that nature. I just am completely unclear about the point you're making. How does that inform our analysis in terms of the credibility of what we have, the reliability, the circumstantial guarantees of trustworthiness? Right. I think the focus of this court's analysis is not on the credibility of Ms. O'Donnell and Ms. Rogers, but on the circumstances facing Ms. Green. Clearly, under all the authority, we have to analyze whether Ms. Green had a motive to lie under those circumstances. The question when analyzing this, courts have said, did this person have any reason to fear consequences from a false statement or any reason to think that she'd be found out having made a false statement? The fact that Transamerica was motivated to investigate this, I do not think is informative of what Courtney Green understood in her position, given that Transamerica's practices were never explained to her. We just got into this discussion because so much of the focus of your challenge to the circumstantial guarantees of trustworthiness is the motivation of the mother. And I was simply pointing out that there is support for the mother's version. So you're going back to the beginning. That's fine. Right. I would suggest it's the actions of the mother rather than the motivations of the mother, and that if we look too closely at what Ms. O'Donnell said about Ms. Green's version of events, you're relying on the account of a person who's – you're relying on the account of Courtney Green after her mother's impersonated her, apparently, and she knows about this, and after she's been threatened by her mother in her mother's presence. No. Well, okay. Right. Anyway, in the brief time I have left in this opening session, I would only point out that of the – what we've, I hope, highlighted for the court as the errors in the district court's analysis, I think the most pertinent and salient one comes in its point about analyzing the motive to lie that Courtney Green had. And as his analysis put it, it was that Courtney Green had no motive to lie, even considering the threat from her mother, because the defense, that is, we hadn't proved that she'd actually lied. And this was wrong, we submit, Your Honors, for two independent reasons, the first being that since we were not in the movement, we had no burden of proof or persuasion with regard to the residual exception. And second, because the question whether Ms. Green actually lied is not relevant to the question whether or not she had a motive to lie, which is the focus of the analysis under the residual exception. There were two other points I would talk about in terms of the specific errors of the district court. We've covered this briefly, but it is clearly an abuse of discretion not to put all of the relevant facts into the analysis concerning the circumstantial guarantees of trustworthiness. On that point, you can search throughout the district court statement on the record at the actual hearing itself or in its post-trial order, and there was no mention of the fact that Ms. Green did not disclose the policy to her mother or discuss the premiums with her, notwithstanding that she was having those discussions with my client, and therefore consciously kept this information from her mother. There was also no consideration of the subject matter of her statement, including the fact that her mother had an interest in the policy. And without looking at the subject matter, I don't think we can reasonably conclude that a statement to a parent just for that reason is sufficiently trustworthy to meet standards. I see my time has expired. See you on the rebuttal. Thank you. Thank you. Good morning, Your Honors. Grace Hill on behalf of the United States. This court should affirm the district court's decision to admit these statements because the district court neither abused its discretion nor acted in an arbitrary or irrational manner.   It was a lengthy evidentiary hearing in this manner. It heard from live witnesses. The district court also listened to audio recordings, including a one-hour long recording of Courtney Green's statements to the local police that was conducted at her home. The district court also reviewed numerous exhibits submitted by both sides in advance of the evidentiary hearing. I did have a question about the interview with the police and why it helped me understand why the hearsay was necessary, given the other evidence in this case. Certainly, Your Honor. The hearsay evidence we would submit, and that goes to one of the prompts of Rule 807, which is whether the statements were the most probative evidence of fraud. Here we would submit that because they are the most direct evidence of what the deceased victim's intent and will were. These are her statements about her own will, about what she is best placed, has the best personal knowledge as to what her intent and will were with respect to the disposition of the life insurance proceeds. That makes any argument. I guess I have a few more questions about whether it can be a badge of reliability that you would not lie to your mother. It seems to me that the vast majority of lies are made to mothers and fathers, no matter what the age of the children, grandchildren. That in itself didn't kind of grab me. But then it seemed to me that maybe the government had a harmless error argument. But now you've just told us that this is the most critical evidence that you have in the case. So maybe you can sort all that out for me. Sure. I would say that this was the most probative evidence of her intent. However, the error, if there was any error, would have been harmless because of the other evidence. And so there's a difference between, I think, best evidence and only evidence. The government here had overwhelming evidence to support the conviction, including— And that goes back—I'm sorry. Oh, no, you go ahead. That goes back to the— You rely on this residual exception because it's a necessity, kind of. It's almost a manifest injustice exception. You need this evidence to get to the right result in the case. And so I'm a little—some of my unease is, do you need this evidence to get to a conviction in this case? Well, certainly there is a tension between the third prong and the harmless error standard. It's a fine line to walk there. I think, again, I would say that it was harmless because the jury certainly would have rendered the same verdict. They would have done so, however, without the most probative evidence of the defendant's intent. And I guess from the government's perspective, you don't want to make that judgment call. I mean, you want to have the broadest array of evidence. Absolutely. And so you don't want to be in the position of not utilizing evidence that you think is probative because it's ultimately the determination of the finder of fact. That's absolutely correct, Your Honor. I can see that. Well, that's certainly true, but it doesn't mean you can get evidence in that violates the rules, right? Well, certainly so. I mean, the government always wants everything in. I've got that, Pam. Well, let me turn that to you. Judge, maybe in relation to that point, I mean, we do have one in the circuit that talks, and other circuits are consistent, that talks about 807 being very narrowly drawn. So, and I have a concern with that, you know, that precedent that we're bound by and whether we have something here, you know, that if this is narrowly drawn, what isn't narrowly drawn? I mean, does it completely throw out the other hearsay rules? I understand the harmless error issue and appreciate you raising that. But before we get there, how is this a narrowly drawing of the 807 rule? Certainly. And I don't believe this Court does need to reach the harmless error standard because I believe the circumstances of this case does fit exactly what the writers of Rule 807 anticipated. What this case shows is that the application of the residual exception is a highly fact-specific inquiry in which deference to the district court's decision is particularly appropriate. And the reason why is because the district court, the reason why the district court had this lengthy evidentiary hearing and listened to all this audio evidence is because it had to make determinations of credibility with respect to witnesses who testified to the motivations of Courtney Green in making the statements and also to the other circumstances in which the statements were made. Well, the first and most important element, right, is the statement has the equivalent circumstantial guarantees of trustworthiness. Yes. And that's why it seems it's a hard road for me to say that the statement to your mother has the equivalent circumstantial guarantees of trustworthiness. And let me go directly to that point. Okay. That is not the government's argument here, that the statements are trustworthy because they were made to her mother. That is the gloss that the defendant has put on the government's argument. But it is one of the things that the district court mentioned, as I recall, although I think fairly contextually, because of the care aspect of the circumstances that were existing as the screening was done. Yes. The district court is all over the relationship. The relationship was in the home. One person was taking care of the other. There was an extended discussion, and I would say a reliance, on the relationship with the mother as evidencing the equivalent to a circumstantial guarantee of trustworthiness. Absolutely. So that may not be the government's position, but that's what the district court relied on. Well, let me clarify what the government's position is. We're not taking the position that because this was simply a mother-daughter relationship, it is reliable. That's not what we're arguing. We're saying that the relationship between this mother and daughter. I understand that. Right. So the credibility determination that had to be made by the court was whether this mother would have occasioned fear in this daughter, whether this mother was agreed to inherit from her daughter's life insurance proceeds to the extent that it would cause— The mother was paying the bills. So there was a financial component to it as well. And the mother had been angry at the daughter? I mean, the mother—I mean, I think that sort of helps the mother's credibility that she acknowledges that. But, I mean, that's a fact that no one disputes, right? Well, I think that listening to the audio recording, what is very obvious is that the mother's anger was directed not at the daughter, but at the defendant for trying to get her daughter to lie. And if you listen to the audio recording in which the daughter— Did the mother dispute that she said that if you're going to lie, you're going to have to get out of the house and live with your brother?  I thought she acknowledged that. No, no. She absolutely acknowledges that. Well, then that's not just anger at someone else because you have this very sick daughter and you're moving her. There's some anger toward the daughter there. Well, I think what the mother testified to during the evidentiary hearing and at trial was that her anger was directed at the— I understand what she said, but we know what the action was. We know what she said, and we now know the gloss that she's put on it in her testimony. Which the district court did to credit, in fairness. Sure. Correct. The district court did— It gives credit to both, though. Yes. Well, the crux of the defendant's argument with respect to the mother's credibility is that she was greedy to inherit this money and that rich people want money, too. Now, far be it from a white-collar prosecutor to disagree with the premise that rich people like money, but even more basic than the premise that rich people like money is that no parent wants to profit from their child's death. Well, I'm not sure you have to go there. I would actually prefer you to go back to the requirements of 807, and we talked about this statement of the mother having the equivalent circumstantial guarantees of trustworthiness. Correct. And I'm not sure—I think we've strayed a little bit from that. So you're saying that you listen to the tape, and she says—she says, and then she testifies that she wasn't mad at her daughter, she was mad at the other one. Okay. Well— So then you can show that she's trustworthy that way. To be clear, the credibility—the reason why we're discussing the credibility of the witnesses and whether the mother loved her daughter is because it goes to whether or not Courtney Green had a motive to lie to her mother in making these statements. And motive, as this court and many other circuits have consistently explained, and as the defendant admits, is one of the most important circumstances to consider in judging whether a statement has the requisite indicia of trustworthiness. So that is—that's the reason why, you know, the government goes back to the justice court's determinations on the credibility. And we believe those credibility determinations from the district court that was able to actually hear from these witnesses should be given deference. But let me turn to some of the other circumstantial guarantees of trustworthiness here. One enumerated exception to which we compare, which the government did not discuss in our brief but which I do want to raise for the court's consideration, is the dying declaration exception. That is Federal Rule of Evidence 8042. Courtney Green's statements were not made under the belief of imminent death, but she knew that she had stage IV cancer, and she knew that the chances of making a recovery from a cancer that has already spread to your spine are very slim. Those are the very stark circumstances under which she made the statements at issue here. Now, the defendant's version of events would have required the district court to believe that Courtney Green chose to spend the last months of her life telling lies to everyone around her, lies to her mother, lies to the insurance company, lies to the bank, lies to the police, lies to federal law enforcement, and lies to the twin brother that she loved. Sorry, go ahead. Are you going to get to O'Donnell's statements as well? Yes, if the court wishes to hear about that, I can skip directly to those statements. No, no, I don't want to interrupt the flow of your argument. I'd like you to get there. Okay, yes, absolutely. Let me just say finally with respect to the dying declaration exception that the same circumstances were present in United States v. McConn, which is a case in which this court affirmed the use of Rule 807 to admit the statements of a declarant who was gravely ill and expected to die within two years of making those statements. And this court found that those circumstances made his statements likely to be truthful, citing a Supreme Court case for the proposition that the sense of impending death is presumed to remove all temptation to falsehood and to enforce a strict adherence to the truth. Did you argue dying declaration to the district court at trial? We did not, Your Honor. And did the district court rely on it? The district court did not. Okay. But I just wanted to say to you that my unease is not to all these other statements. It's to the reliance that was placed on the statement to the mother, and that's what I personally have unease, I would say. And that's what I was asking you. So you're saying to me that we'd have to hold that she lied to everybody. I don't really think those two things follow. I think we're supposed to look at each statement to see if it comes in under one of the provisions of the rules. And I'm focusing on that statement. Okay. Well, then, just specific to the statements to the mother, certainly the dying declaration exception would apply there as well. Courtney Green knew that she was very likely dying, and she had stage four. Well, we usually don't adopt arguments that are made for the first time at oral argument. I understand. We don't affirm on any grounds. We certainly can't. We certainly can't. Correct. But that isn't the basis of what the district court did. Let me just address Judge Motz's concern with the statements to the mother very quickly, and then I'll turn to the statements to the insurance company. So I think that the things that the court should look to there are to the fact that she did make these statements under the circumstances in which she had stage four terminal cancer. So the statements to her mother was made under circumstances in which Courtney Green would have known that she was dying. And under those circumstances, as opposed to a teenage daughter lying to her parents about, you know, who her boyfriend is, that's a very different kind of situation and circumstances under which a statement is made. So I think the court can rely on that. But she wants to please her mother at this point. I don't see that necessarily. Well, that is the defense's characterization of the facts. But there's no evidence in the record to support that Courtney Green was just trying to please her mother. That's not what the evidence showed. No, but, I mean, that's not inconsistent. I guess I don't understand the government's argument. It would be one thing if she said because she's fearing death, oh, mother, I broke your china closet, you know, sort of laying all. But this isn't something. This would be, oh, mother, I bought you a wonderful Christmas present. I mean, it's not something the mother is going to be unhappy about, right? Well, I think the other two circumstances that the government would rely on are the fact that the district court determined credibility-wise there was no motive to lie to her mother. And second, the excited utterances exception, which we did go over in our brief, so I won't repeat that argument here. I do want to quickly address Judge Duncan's concern with his statement to the insurance company. I will say I think that you have that argument very well in hand. You said all the things that I would have said had I had more time. But absolutely, I think it's absolutely common sense that no one expects to call up the insurance company and just say, oh, you paid the wrong person, and then expect the insurance company to automatically say, oh, well, we're sorry. We'll issue you a check for $180,000 right away, even though we've already paid out that money to apparently the wrong person. You call the insurance company to report fraud because you want them to investigate the fraud, find the fraud, and then pay you the money. And certainly it goes against Courtney Green. I think any person, any rational adult would have known that, and those are the circumstances under which she reports the fraud to the insurance company. Finally, I would just like to briefly touch on the fourth prong, the interest of justice here. The defendant is in the untenable position of arguing that the truth does not matter and that this court should completely disregard the truth of the statements. The government believes that the court absolutely can and should consider the fact that the other evidence in this case overwhelmingly corroborated the truth of the statements that were made. So it would have been against the interest of justice to bar these statements. And I will just say that the most damning of that evidence in the government's view is the testimony of the two straw beneficiaries who were close friends of the defendant. One of them wrote a letter in support of the defendant's sentencing and arrived to support her at the sentencing, and yet they testified that they had never discussed this with Courtney Green. They didn't know they had been made beneficiaries until law enforcement showed up at their door. They could think of no legitimate reason why they would have been made the beneficiaries. The defendant to this day is unable to offer any innocent explanation for this unimpeached testimony from live witnesses sympathetic to the defendant. And that evidence bears on 8-4. I assume the government's position also bears on if there was an error of the harmless nature of it. Is that correct? Yes, absolutely, Your Honor. Absolutely. But it's in some tension with the evidence under 8-07 is the most probative. I will concede that that is also true. Well, the evidence that these witnesses gave, I would submit, completely defeats the defendant's version that Courtney Green agreed to this arrangement in order to get the money to the defendant. And it also shows the defendant herself to be a liar because she told the insurance company's investigators in trying to justify her actions that Courtney Green had been close friends with these women, one for 8 years and then with the other one for 15 years. And yet these women both testified under oath at trial that they were only acquaintances of Courtney Green's and they had never spoken to her about being made her beneficiaries. What sentence was imposed here? The sentence, I believe, was 48 months, Your Honor. And she's in jail now? No. She was granted bail pending appeal and also the district court delayed her reporting for sentencing based on some circumstances that the defendant put forward. So, no, she's not currently being held. Unless the court has any further questions, the government would simply submit that the federal rules state that they should be construed towards the end of ascertaining the truth and securing a just determination. Here, the district court found, after careful consideration of witness testimony and evidence, that the statements it admitted were trustworthy and reliable. This decision was neither arbitrary nor irrational. It was not an abuse of discretion and it should be accorded deference. So we ask, therefore, that the judgment of the district court be affirmed. Thank you. Thank you. It says 24 months. It was 48, actually? Your brief says 24. Yes, Your Honor. Somebody's brief says 24. To take up Your Honor's question, it was 24 months. The government's brief says 24. That's correct. Just briefly to walk through some of the points the government made up to take them, I think, in reverse order, unless the court has a preference. It is true, as Ms. Hill points out, that there was a change of beneficiaries, but that fact was fully consistent with the defense that we offered at trial, which was that the declarant wanted to leave the insurance proceeds to her lifelong best friend but did not want her family to know that she'd made such a generous gift. And this was one aspect of implementing that in the event that Ms. Green happened to die before the check for the accelerated death benefits came in. So this is not an outlier event for which there is no innocent explanation. These are the two friends who didn't. Is that what you're talking about? Correct. The last point. That's correct. I understand Ms. Hill's point also that the interest of Justice Prong does examine the truth, certainly, but it goes much broader than that, I think. The interest of Justice Prong is also concerned with the finding of guilt or innocence through a fair process. And certainly no one would consider a fair trial or a trial to be fair, even if the witness told the truth, if the defendant wasn't given an opportunity to cross-examine. That's this case.  If I could maybe stop you there, and I apologize if I'm interrupting, but assume for the sake of this question that I agree with you and that the elements of 807 weren't met. What's your argument that this was not a harmless error in light of the other evidence that was presented against your client? Right. The harmless error standard, Your Honor, it's the government's burden to show that the evidence they offered in the form of the hearsay had only a very slight effect or no effect on the verdict, on the judgment of conviction. Well, that's not really, I don't think that's the test. I don't mean to interrupt, but I think the language is, yeah, that on the standard of view is that there's a fair assurance after considering everything without stripping out the remuneration that the judgment was not substantially swayed by. I think that's the standard, isn't it? Am I right about that? I don't think we put it that way in our briefs. Well, that's the quote. All right, all right. To that point, Your Honor, this was the centerpiece of the government's case, both at trial, in its closing, in its opening, and in its pre-motion briefing. But that makes it the most probative. I mean, the problem, I get into a circle. The analytical difficulty that I'm having with this case has nothing to do with whether or not I would like to have Ms. Cunningham as a friend. The problem I'm getting into is it's, and the government has the same conundrum. It's the centerpiece because it would seem to be the most probative. But that cuts against harmless error, but it also supports the probativeness. Right, right. But to complete my answer to Your Honor's question, and I hope address Judge Duncan's question as well, the only other evidence in this case that there was a forgery on the forms, and that was the crux of the evidence on the wire fraud and on the mail fraud charges. The only other evidence of forgery was the testimony of Ms. Green's mother, who said that the signatures on these forms are not genuine. She could not identify those signatures when I cross-examined her. She was unable to distinguish between any of the admittedly genuine ones versus the allegedly forged ones. So without any direct evidence of forgery, I don't see how we can conclude that Courtney Green's testimony that she did not. What about what we have of the discussions with the police? Well, that was not admitted, Your Honor. That statement was solely admitted for the, or came in only on the analysis on the motion in limine. Not at trial, not at trial, but yes, yes. And just in follow-up, Judge Quattlebaum, all of the other evidence that was put forward in support. So that does go back to, that does, okay. Yeah, right. All of the other evidence that was put forward by the government in support of their theory that this was not an authorized transfer of funds was consistent with our point and our defense that what was really intended here was to make a generous gift to a lifelong friend without family members knowing about it. And I get, I guess I understand your argument. But, I mean, you know, that your client changed the contact information to her, called Transamerica about accelerating the benefits. And since the change of beneficiary forms in without Green's signature, changed the beneficiaries not to herself but to two friends who didn't know what was going on, and then spent the money on TVs and video games and clothes. That's, I mean, I understand maybe. And that doesn't include the evidence of the fraud of Transamerica's fraud investigator. I understand that. That's true. But on that point, the bolstering of that fraud investigator statement was the government's claim that they had searched through all of my client's e-mails to show some back and forth between her and the decedent when the other evidence in the case showed that the mother had access to that e-mail account and that she and her son had actually wiped all the drives. So all the other evidence that we're talking about that would support the conviction that Ms. Hill, that the government has talked about, has vulnerabilities that the hearsay cannot overcome, or that would exist without the hearsay and would make it for a very different trial in the event that the hearsay were not introduced. I see my time has expired. If there are no further questions, I'll leave the podium. Thank you. Thank you very much. We will come down and greet the lawyers and then go to our last case.
judges: Diana Gribbon Motz, Allyson K. Duncan, A. Marvin Quattlebaum Jr.